IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JIMMIE E. PARKER,            )
AIS #199999,                 )
                             )
        Plaintiff,           )
                             )
    v.                       )        CASE NO. 2:07-CV-624-WKW
                             )              [WO]
                             )
TROY KING, et al.,           )
                             )
        Defendants.          )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a 42 U.S.C. § 1983 action in which Jimmie E. Parker ["Parker"], a former

state inmate and convicted sex offender, asserts that the Alabama Community Notification

Act, *Ala. Code* 1975 § 15-20-20 et seq. (1975, as amended) ["the Act"], is unconstitutional

as applied to him.  Specifically, Parker complains  that application of the Act infringes

upon his constitutional rights to due process and equal protection.  He further agues that the

Act violates the separation of powers and imposes unconstitutional punishment under the

Ex Post Facto, Bill of Attainder and Double Jeopardy Clauses.  Parker also maintains that

the Act violates his right against self-incrimination, is overly broad and § 15-20-26(a) is

void for vagueness.  This case is currently before the court on Parker's motion for

preliminary injunction in which he requests that the court prohibit enforcement of the Act's

registration and community notification provisions pending resolution of this lawsuit.  He

also requests that defendants not be allowed to enforce the employment and residency

restrictions contained in the Act.  For the reasons set forth below, the court concludes that the plaintiff's motion for preliminary injunction should be denied.

## I.  BACKGROUND

"In response to the 1994 abduction, rape, and murder of a seven-year-old girl, Megan Kanka, by her neighbor, a convicted sex offender, Congress along with all 50 states enacted laws requiring sex offenders to register their residence with local law enforcement. *See Smith v. Doe*, 538 U.S. 84, 89-90, 123 S.Ct. 1140, 1145, 155 L.Ed.2d 164 (2003). Concerned by Megan's murder and the high number of repeat sex offenders, states enacted these laws for the purpose of notifying the public about local sex offenders and to aid law enforcement in identifying and locating potential suspects in local sex-related crimes. *See Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 4, 123 S.Ct. 1160, 1163, 155 L.Ed.2d 98 (2003)." *Doe v. Moore*, 410 F.3d 1337, 1340 (11th Cir.), *cert. denied*, *John Doe I v. Moore*, 546 U.S. 1003, 126 S.Ct. 624, 163 L.Ed.2d 506 (2005).  The Community Notification Act is Alabama's version of such a law.

### A.  The Alabama Community Notification Act

The Alabama Community Notification Act became effective in 1996 but has since been amended on several occasions to address various constitutional challenges presented to the Act itself and similar versions of Megan's Laws adopted by other states.[1]  The

---

[1] In this Recommendation, the court addresses the Act in its current state as the provisions contained therein are the provisions relevant to the claims pending before this court.

Alabama Community Notification Act nevertheless remains one of the most far-reaching and restrictive sex offender registration laws in the United States as it requires adults convicted of various sex offenses, regardless of the date of their conviction(s), to register with law enforcement officials prior to their release into society,[2] *Ala. Code* § 15-20-22, and upon a change in their legal residence. *Ala. Code* § 15-20-23. The Act also mandates that law enforcement officials notify members of the public whenever a registered offender establishes a residence in their community.[3] Additionally, the Act places significant restrictions on where and with whom a registrant may live and work. *Ala. Code* § 15-20-26.

### 1. Applicability of Act

"A person convicted of a criminal sex offense [listed in § 15-20-21(4)], ***including***

---

[2]The Act defines release as "[r]elease from a state prison, county jail, or municipal jail, or release or discharge from the custody of the Department of Youth Services or other juvenile detention, or placement on an appeal bond, probation or parole or aftercare, or placement into any facility or treatment program that allows the offender to have unsupervised access to the public." *Ala. Code* § 15-20-21(10).

[3]Alabama law likewise requires that "any person, except a delinquent child, ... residing in Alabama, [who] has heretofore been convicted, or shall be convicted in any state or municipal court in Alabama, or federal court, or so convicted in another state in any court having jurisdiction similar to the jurisdiction of state and municipal courts in Alabama for [any act of sexual perversion involving a member of the same or the opposite sex, any sexual abuse of any member of the same or the opposite sex, rape, sodomy, sexual misconduct, indecent exposure, promoting prostitution, obscenity, incest or the attempt to commit such offenses], ... shall, upon his or her release from legal custody, register with the sheriff of the county of his or her legal residence within seven days following such release.... For purposes of this article, a conviction includes a plea of nolo contendere, regardless of whether adjudication was withheld. Any person having been so convicted shall upon moving his legal residence from one county to another register with the sheriff of the county to which he has moved within seven days after such removal." *Ala.Code* 1975 § 13A-11-200(b)-(c). The Community Notification Act does not "preclude any criminal sex offender from registering in accordance with Section 13A-11-200" but directs that "such registration unless otherwise proscribed by this article does not trigger public notification." *Ala. Code* § 15-20-33(c).

*a person who has pleaded nolo contendere to a criminal sex offense*, regardless of whether adjudication was withheld" is considered an adult criminal sex offender under Alabama law subject to the Act's registration, notification, residency and employment provisions upon his release into society. *Ala. Code* § 15-20-21(1).[4] The statute identifies "criminal sex offense" as any of the following offenses: rape, sodomy, sexual torture, sexual abuse, enticing a child for immoral purposes, promoting prostitution, violation of the Alabama Child Pornography Act,[5] kidnapping of a minor (except by a parent), incest (when the offender is an adult and the victim is a minor), and soliciting a child by computer for purposes of committing a sexual act and transmitting obscene material to a child by computer in violation of the criminal code. *Ala. Code* § 15-20-21(4)a-j. "Any solicitation, attempt, or conspiracy to commit any of the [aforementioned] offenses" is likewise a "criminal sex offense" under the Community Notification Act, *Ala. Code* § 15-20-21(4)k., as is "[a]ny crime committed [in another] jurisdiction, which, if it had been committed in this state under the current provisions of law, would constitute an offense" defined in the Alabama Community Notification Act as a criminal sex offense. *Ala. Code* § 15-20-21(4)*l*. Additionally, the Act provides that "[t]he foregoing notwithstanding, ***any crime committed***

---

[4]The Act does not exempt convictions based on their date of imposition and therefore applies to any person previously convicted of a criminal sex offense regardless of when the sex offense conviction occurred.

[5]The Alabama Child Pornography Act proscribes: (1) the dissemination or public display of child pornography, 1975 Ala.Code § 13A-12-191; (2) the possession of, and possession with intent to disseminate, child pornography, *id*. § 13A-12-192; and (3) the production of child pornography, *id*. § 13A-12-196 and § 13A-12-197. This Act defines a child as a person under the age of 17 years.

4

*in any jurisdiction which, irrespective of the specific description or statutory elements thereof, is in any way characterized or known as* rape, sodomy, sexual assault, **sexual battery**, sexual abuse, sexual torture, solicitation of a child, enticing or luring a child, child pornography, lewd and lascivious conduct, taking indecent liberties with a child, or molestation of a child" is considered a "criminal sex offense" for purposes of applying the Community Notification Act to an offender. *Ala. Code* § 15-20-21(4)m. (emphasis added).

If a person is deemed to have committed a criminal sex offense under the concomitant jurisdiction provision set forth in § 15-20-21(4)*l*., he is provided an administrative hearing to challenge that determination. *Ala. Code* § 15-20-38(a). However, once the Alabama Department of Public Safety "set[s] forth a listing of offenses from other jurisdictions that are to be considered criminal sex offenses under Section 15-20-21(4)*l.* [as directed by the Act] ... any individual convicted of any offense set forth in the listing shall immediately be subject to this article and shall not be entitled to an administrative hearing as [previously] provided...." *Ala. Code* § 15-20-38(b). Application of the Act's provisions is unlimited in duration to an adult criminal sex offender. *Ala. Code* § 15-20-33(a) ("Any adult criminal sex offender shall be subject to this article for life."). With respect to a juvenile criminal sex offender residing in this state, the offender is "subject to this article for a period of ten years from the last date of release. A juvenile criminal sex offender who is subsequently convicted as an adult criminal sex offender within the ten-year period shall be considered solely an adult criminal sex offender." *Ala. Code* § 15-20-33(b).

5

## 2.  Residency and Employment Restrictions

The Act contains several restrictions on residency and employment for an adult criminal sex offender.  These restrictions appear as follows:

(a) Unless otherwise exempted by law, no adult criminal sex offender shall establish a residence or any other living accommodation or accept employment within 2,000 feet of the property on which any school or child care facility is located.

(b) Unless otherwise exempted by law, no adult criminal sex offender shall establish a residence or any other living accommodation within 1,000 feet of the property on which any of his or her former victims, or the victims' immediate family members reside.

(c) No adult criminal sex offender shall establish a residence or any other living accommodation where a minor resides. Notwithstanding the foregoing, an adult criminal sex offender may reside with a minor if the adult criminal sex offender is the parent, grandparent, or stepparent of the minor, unless one of the following conditions applies:

(1) The adult criminal sex offender's parental rights have been or are in the process of being terminated as provided by law.

(2) The adult criminal sex offender has been convicted of any criminal sex offense in which any of the offender's minor children, grandchildren, or stepchildren were the victim.

(3) The adult criminal sex offender has been convicted of any criminal sex offense in which a minor was the victim and the minor resided or lived with the offender at the time of the offense.

(4) The adult criminal sex offender has ever been convicted of any criminal sex offense involving a child, regardless of whether the offender was related to or shared a residence with the child victim.

(d) No adult criminal sex offender shall be permitted to willfully or knowingly come within 100 feet of any of his or her former victims, except as elsewhere provided by law, or make any visual or audible sexually suggestive or obscene gesture, sound, or communication at or to a former victim or a member of the victim's immediate family.

(e) Changes to property within 2,000 feet of an adult criminal sex offender's registered address which occur after an adult criminal sex offender establishes residency or accepts employment shall not form the basis for finding that a criminal sex offender is in violation of subsections (a) or (b).

(f) No adult criminal sex offender, after having been convicted of a criminal

6

sex offense involving a child, shall loiter on or within 500 feet of any property on which there is a school, child care facility, playground, park, athletic field or facility, or any other business or facility having a principal purpose of caring for, educating, or entertaining minors. Under this subsection, "loiter" means to enter or remain on property while having no legitimate purpose therefor or, if a legitimate purpose exists, remaining on that property beyond the time necessary to fulfill that purpose. An offender does not violate this subsection unless he or she has first been asked to leave a prohibited location by a person authorized to exclude the offender from the premises. An authorized person includes, but is not limited to, any law enforcement officer, any owner or manager of the premises, a principal or teacher if the premises is a school or child care facility, or a coach if the premises is an athletic field or facility.

(g) No adult criminal sex offender, after having been convicted of a criminal sex offense involving a child, shall accept, maintain, or carry on any employment or vocation at or within 500 feet of a school, child care facility, playground, park, athletic field or facility, or any other business or facility having a principal purpose of caring for, educating, or entertaining minors.

(h) An adult criminal sex offender who knowingly violates the provisions of this section shall be guilty of a Class C felony.

*Ala. Code* § 15-20-26(a)-(h).[6]

The Act likewise limits the circumstances under which a criminal sex offender may change his name. *Ala. Code* § 15-20-36 ("No criminal sex offender shall be allowed to change his or her name unless the change is incident to a change in the marital status of the criminal sex offender or is necessary to effect the exercise of religion of the criminal sex offender. Such a change must be reported to the sheriff of the county in which the criminal

---

[6]The Act defines a child care facility as "[a] licensed daycare center, a licensed child care facility, or any other child care service that is [under applicable state law] exempt from licensing[,]" *Ala. Code* § 15-20-21(2), and a school as "[a] licensed or accredited public or private school, or church school, that offers instruction in grades K-12 ... [excluding] private residences in which students are taught by parents or tutors." *Ala. Code* § 15-20-21(13). The term employment "[i]ncludes employment that is full-time or part-time for any period, whether financially compensated, volunteered, or for the purpose of government or educational benefit." *Ala. Code* § 15-20-21(6).

sex offender resides within 30 days of the effective date of the change. If the criminal sex offender is subject to the notification provision of this article, the reporting of a name change under this section shall invoke notification."). Under an amendment effective September 1, 2006, "[e]very adult criminal sex offender who is a resident of this state shall obtain and always have in his or her possession either a valid driver's license or identification card issued by the Alabama Department of Public Safety. If any offender is ineligible to be issued a driver's license or official identification card, the Department of Public Safety shall provide the offender some other form of identification card or documentation that ... shall satisfy the requirements of this section. If any adult criminal sex offender is determined to be indigent, an identification card or other documentation in lieu thereof shall be issued to the offender at no cost. An adult criminal sex offender who knowingly violates this provision shall be guilty of a Class C felony.... Whenever the Department of Public Safety issues or renews a driver's license or identification card to an adult criminal sex offender, the driver's license or identification card shall bear a designation that enables law enforcement officers to identify the licensee as a criminal sex offender." *Ala. Code* § 15-20-26.2(a)-(b)

### 3. Registration of Criminal Sex Offenders

Forty-five days prior to release from custody, a criminal sex offender must "declare in writing or by [approved] electronic means ... the actual address at which he or she will reside or live upon release and the name and physical address of his or her employer, if any.

Any failure to provide timely and accurate declarations shall constitute a Class C felony. Any adult criminal sex offender in violation of this section shall be ineligible for release on probation or parole." *Ala.Code* § 15-20-22(a)(1). The Act requires that the responsible agency notify law enforcement officials of the registered sex offender's address. *Ala. Code* § 15-20-22(a)(2)-(3). "The notification shall include all information available to the responsible agency which would be necessary to identify and trace the adult criminal sex offender, including, but not limited to, the offender's declared places of residence and employment, each sex offense history or pre-sentence investigation of the sex offense, fingerprints, and a current photograph of the adult criminal sex offender." *Id*. Registration also applies to criminal sex offenders who are convicted after the effective date of the Act but who are not sentenced to a term of incarceration. *Ala. Code* § 15-20-22(b). If a sentencing court does not impose a sentence of incarceration for a criminal sex offense, the court itself must register the offender with law enforcement officials within 24 hours of release. *Id*. The Act requires a registered sex offender to verify his address shortly after release and then annually thereafter. *Ala. Code* §15-20-24(a). Within 10 days of receipt of a verification form sent by the Alabama Department of Public Safety, an offender "shall present in person the completed verification form" to appropriate local law enforcement officials "who shall obtain fingerprints and a photograph...." *Ala. Code* § 15-20-24(b). All adult criminal sex offenders are required to notify law enforcement officials of their intent to transfer legal residence or place of employment at least 30 days prior to any change in

9

either such status. *Ala. Code* § 15-20-23 and *Ala. Code* § 15-20-23.1. Any violation of these registration requirements constitutes a Class C felony.

### 4. Community Notification

The Alabama Community Notification Act provides for mandatory community notification upon release of a criminal sex offender and upon receipt by law enforcement officials of the required notice that an offender intends to change his or her legal residence. *Ala. Code* § 15-20-25(a). The comprehensiveness of the required notice varies by location. In Birmingham, Huntsville, Mobile and Montgomery, notice of the sex offender's residence must go out to all residences "within 1,000 feet of the declared residence of the adult criminal sex offender" and to all schools and childcare facilities within three miles of such residence. *Ala. Code* § 15-20-25(a)(1). "In all other cities in Alabama with a resident population of 5,000 or more, [the designated law enforcement official] shall notify all persons who have a legal residence within 1,500 feet of the declared residence of the adult criminal sex offender and all schools and childcare facilities within three miles of the declared residence of the adult criminal sex offender, that the adult criminal sex offender will be establishing his or her residence." *Ala. Code* § 15-20-25(a)(2). In all other areas of the state, "the sheriff of the county in which the adult criminal sex offender intends to reside shall notify all persons who have a legal residence within 2,000 feet of the declared residence of the adult criminal sex offender, and all schools and child care facilities within three miles of the [sex offender's] declared residence, that the adult criminal sex offender

will be establishing his or her residence." *Ala. Code* § 15-20-25(a)(3).

Notification occurs by distribution of a "community notification flyer" via "regular mail or hand delivered to all [requisite] legal residences....  In addition, any other method reasonably expected to provide notification may be utilized, including, but not limited to, posting a copy of the notice in a prominent place at the office of the sheriff and at the police station closest to the declared residence of the released criminal sex offender, publicizing the notice in a local newspaper, or posting electronically, including the Internet, or other means available." *Ala. Code* § 15-20-25(b).  The community notification flyer "shall include the following information on the criminal sex offender:  Name; actual living address; sex; date of birth; complete physical description, including distinguishing features such as scars, birth marks, or any identifying physical characteristics; and a current photograph.  This notification shall also include a statement of the criminal sex offense for which he or she has been convicted, including the age and gender of the victim, the geographic area where the offense occurred, and the date upon which the criminal sex offender will be released.  This notification shall also include a statement that the same information is on file [with local law enforcement officials], and that the information will be available to the general public for inspection and identification purposes during regular business hours." *Ala. Code* § 15-20-21(3).

### 5.  Legislative Intent

In an amendment to the Community Notification Act effective September 1, 1999,

with the last paragraph added by amendment on October 1, 2005, the Alabama legislature

expressed its intent in passing the Act. *Ala. Code* § 15-20-20.1. This section, in pertinent

part, states that:

> The Legislature finds that the danger of recidivism posed by criminal sex offenders and that the protection of the public from these offenders is a paramount concern or interest to government. The Legislature further finds that law enforcement agencies' efforts to protect their communities, conduct investigations, and quickly apprehend criminal sex offenders are impaired by the lack of information about criminal sex offenders who live within their jurisdiction and that the lack of information shared with the public may result in the failure of the criminal justice system to identify, investigate, apprehend, and prosecute criminal sex offenders.
>
> The system of registering criminal sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct. Comprehensive registration and periodic address verification will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly. It will allow them to alert the public when necessary for the continued protection of the community.
>
> Persons found to have committed a sex offense have a reduced expectation of privacy because of the public's interest in safety and in the effective operation of government. In balancing offender's due process and other rights, and the interests of public security, the Legislature finds that releasing information about criminal sex offenders to law enforcement agencies and, providing access to or releasing such information about criminal sex offenders to the general public, will further the primary government interest of protecting vulnerable populations and in some instances the public, from potential harm. The Legislature further finds that residency and employment restrictions for criminal sex offenders provide additional protections to vulnerable segments of the public such as schools and child care facilities.
>
> * * *
>
> Therefore, the state policy is to assist local law enforcement agencies' efforts to protect their communities by requiring criminal sex offenders to register, record their address of residence, to be photographed, fingerprinted, to authorize the release of necessary and relevant information about criminal

sex offenders to the public, to mandate residency and employment restrictions upon criminal sex offenders, and to provide certain discretion to judges for application of these requirements as provided in this article.

The Legislature declares that its intent in imposing certain reporting and monitoring requirements on criminal sex offenders and requiring community notification of the residence and workplace of criminal sex offenders is to protect the public, especially children, from convicted criminal sex offenders.

### B.  The Plaintiff

In 1983, a Kansas court imposed conviction upon Parker for sexual battery against an 8 year-old boy, the child of Parker's live-in girlfriend.  *Exhibits A and B to the Supplemental Response of Defendants King and Coppage - Court Doc. No. 25-2 and Court Doc. No. 25-3.*[7]  This conviction arose from a plea of no contest entered by Parker.  Based on this judgment of conviction, Parker is subject to the Alabama Community Notification Act upon his release from prison.[8]

### II.  DISCUSSION

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court...."  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  This court may grant a preliminary injunction only if Parker demonstrates each of the following prerequisites:  (1) a substantial likelihood of success on the merits; (2) a

---

[7]The State presented evidence in this case that the victim's mother looked into her 8-year old son's bedroom and observed "Parker, sitting naked next to her son....  At that time [the mother] noticed that..., Parker, had an erection and was masturbating, using her son['s] ... hand to masturbate with."  *Exhibit A to the Supplemental Response of Defendants King and Coppage - Court Doc. No. 25-2* at 1.

[8]The court notes that on several prior occasions during his time in the free-world Parker registered as a criminal sex offender in accordance with the provisions of the Alabama Community Notification Act. *Defendants' Exhibit A-F to the July 24, 2007 Special Report - Court Docs. No. 16-2 through 16-7.*

substantial threat of irreparable injury will occur absent issuance of the injunction; (3) the threatened injury to Parker outweighs the potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest. *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to the four requisites." *McDonald's*, 147 F.3d at 1306; *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion). The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994); *see also Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). "'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.' *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir.1990)." *Suntrust Bank v. Houghton Mifflin*

*Co.*, 268 F.3d 1257, 1265 (11ᵗʰ Cir. 2001).

It is clear from the requested relief that Parker does not seek issuance of a preliminary injunction to preserve the status quo of the parties until the merits of his claims have been completely adjudicated - which constitutes the limited purpose of a preliminary injunction. *Suntrust Bank*, 268 F.3d at 1265; *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981). Rather, Parker requests preliminary injunctive relief to alter the status quo and seeks to obtain relief properly sought upon adjudication of the merits of the issues presented in this cause of action but prior to such adjudication.

## A. Likelihood of Success on the Merits

Parker challenges application of the Community Notification Act on the following grounds: (1) violation of the Ex Post Facto, Bill of Attainder and Double Jeopardy Clauses, (2) denial of due process, (3) deprivation of equal protection, (4) infringement on separation of powers, (5) violation of the right against self-incrimination, and (6) overly broad and void for vagueness.

### 1. Ex Post Facto, Bill of Attainder and Double Jeopardy Challenges

Parker contends that the Community Notification Act imposes unconstitutional punishment under the Ex Post Facto and Bill of Attainder Clauses. The Ex Post Facto Clause directs that the government may not apply a law retroactively that "inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). Under the Bill of Attainder Clause, legislatures are forbidden to engage in "[l]egislative acts, no matter what their form, that apply either to

named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Brown*, 381 U.S. 437, 448-49, 85 S.Ct. 1707, 1715 (1965). Imposition of punishment upon Parker under the Act is an essential element to both the ex post facto and bill of attainder challenges pending in this case. Differences among the Ex Post Facto and Bill of Attainder Clauses with respect to the elements of punishment, if any, are not relevant here, and the court will therefore subject these challenges to the same analysis.

Parker also asserts that the Alabama Community Notification Act subjects him to double jeopardy as it inflicts a second punishment for a single offense. In support of this claim, Parker maintains that the registration and notification requirements constitute "the modern day punishment of branding...." *Plaintiff's Complaint - Court Doc. No. 1* at 8. He further complains that failure to comply with the requirements of the Act is a felony offense for which he may be prosecuted. In addition, Parker challenges the requirement of *Ala. Code* § 15-20-26.2 that he "shall obtain and always have in his ... possession either a valid driver's license or [official] identification card" or other form of identification issued by the Alabama Department of Public Safety which "shall bear a designation that enables law enforcement officers to identify the licensee as a criminal sex offender." § 15-20-26.2(a)-(b). Parker maintains that this "is the modern day verison of the historical punishment of branding...." He argues that this code section violates both the Ex Post Facto and Double Jeopardy Clauses.

The Double Jeopardy Clause provides that no "person [shall] be

subject for the same offence to be twice put in jeopardy of life or limb." We have long recognized that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, " 'in common parlance,' " be described as punishment. *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 549, 63 S.Ct. 379, 387, 87 L.Ed. 443 (1943) (quoting *Moore v. Illinois,* 14 How. 13, 19, 14 L.Ed. 306 (1852)). The Clause protects only against the imposition of multiple *criminal* punishments for the same offense, *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938); *see also Hess, supra,* at 548-549, 63 S.Ct., at 386-387 ("Only" "criminal punishment" "subject[s] the defendant to 'jeopardy' within the constitutional mean-ing"); *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975) ("In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution"), and then only when such occurs in successive proceedings, *see Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).

*Hudson v. United States,* 522 U.S. 93, 98-99, 118 S.Ct. 488,493 (1997).

Upon review of Parker's ex post facto, bill of attainder and double jeopardy claims, the court finds the opinion issued in *Smith v. Doe, supra,* dispositive. In *Smith,* the Court addressed an ex post facto challenge to the Alaska Sex Offender Registration Act, an Act strikingly similar to the Alabama Community Notification Act in its registration and notification requirements, brought by individuals convicted of sex offenses prior to passage of the Alaska Act.[9]   Specifically, the Court "considered a claim that a sex offender

---

[9]"The Alaska law ... contains two components: a registration requirement and a notification system. Both are retroactive.... The Act requires any 'sex offender or child kidnapper who is physically present in the state' to register, either with the Department of Corrections (if the individual is incarcerated) or with the local law enforcement authorities (if the individual is at liberty).... Prompt registration is mandated. If still in prison, a covered sex offender must register within 30 days before release; otherwise he must do so within a working day of his conviction or of entering the State.... The sex offender must provide his name, aliases, identifying features, address, place of employment, date of birth, conviction information, driver's license number, information about vehicles to which he has access, and postconviction treatment history.... He must permit the authorities to photograph and fingerprint him.

If the offender was convicted of a single, nonaggravated sex crime, he must provide annual verification of the submitted information for 15 years.... If he was convicted of an aggravated sex offense or of two or more sex offenses, he must register for life and verify the information quarterly.... The offender must notify his local police department if he moves.... A sex offender who knowingly fails to comply with the Act is subject to

registration and notification law constitutes retroactive punishment forbidden by the Ex Post Facto Clause." 538 U. S. at 92, 123 S.Ct. at 1147. The Court determined that "[t]he [Alaska] Act is nonpunitive, and its retroactive application does not violate the Ex Post Facto Clause." 538 U.S. at 105-106, 123 S.Ct. at 1154. The relevant portion of this opinion reads as follows:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Ibid.* (quoting *United States v. Ward,* 448 U.S. 242, 248-249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Because we "ordinarily defer to the legislature's stated intent," *Hendricks, supra,* at 361, 117 S.Ct. 2072," 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Ward, supra,* at 249, 100 S.Ct. 2636); *see also Hendricks, supra,* at 361, 117 S.Ct. 2072; *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).
> Whether a statutory scheme is civil or criminal "is first of all a question of statutory construction." *Hendricks, supra,* at 361, 117 S.Ct. 2072 (internal quotation marks omitted); *see also Hudson, supra,* at 99, 118 S.Ct.

---

criminal prosecution.

   The information is forwarded to the Alaska Department of Public Safety, which maintains a central registry of sex offenders.... Some of the data, such as fingerprints, driver's license number, anticipated change of address, and whether the offender has had medical treatment afterwards, are kept confidential.... The following information is made available to the public: 'the sex offender's or child kidnapper's name, aliases, address, photograph, physical description, description[,] license [and] identification numbers of motor vehicles, place of employment, date of birth, crime for which convicted, date of conviction, place and court of conviction, length and conditions of sentence, and a statement as to whether the offender ... is in compliance with [the update] requirements ... or cannot be located.' ... The Act does not specify the means by which the registry information must be made public. Alaska has chosen to make most of the nonconfidential information available on the Internet." 538 U.S. at 90-91, 123 S.Ct. at 1145-1146 (citations to statute omitted).

488. We consider the statute's text and its structure to determine the legislative objective. *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). A conclusion that the legislature intended to punish would satisfy an ex post facto challenge without further inquiry into its effects, so considerable deference must be accorded to the intent as the legislature has stated it.

The courts "must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Hudson, supra,* at 99, 118 S.Ct. 488 (internal quotation marks omitted). Here, the Alaska Legislature expressed the objective of the law in the statutory text itself. The legislature found that "sex offenders pose a high risk of reoffending," and identified "protecting the public from sex offenders" as the "primary governmental interest" of the law. 1994 Alaska Sess. Laws ch. 41, § 1. The legislature further determined that "release of certain information about sex offenders to public agencies and the general public will assist in protecting the public safety." *Ibid.* As we observed in *Hendricks,* where we examined an *ex post facto* challenge to a postincarceration confinement of sex offenders, an imposition of restrictive measures on sex offenders adjudged to be dangerous is "a legitimate nonpunitive governmental objective and has been historically so regarded." 521 U.S., at 363, 117 S.Ct. 2072. In this case, as in *Hendricks,* "[n]othing on the face of the statute suggests that the legislature sought to create anything other than a civil ⋯ scheme designed to protect the public from harm." *Id.,* at 361, 117 S.Ct. 2072.

Other formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are probative of the legislature's intent. *See Hendricks, supra,* at 361, 117 S.Ct. 2072; *Hudson, supra,* at 103, 118 S.Ct. 488; *89 Firearms, supra,* at 363, 104 S.Ct. 1099. In this case these factors are open to debate. The notification provisions of the Act are codified in the State's "Health, Safety, and Housing Code," § 18, confirming our conclusion that the statute was intended as a nonpunitive regulatory measure. *Cf. Hendricks, supra,* at 361, 117 S.Ct. 2072 (the State's "objective to create a civil proceeding is evidenced by its placement of the Act within the [State's] probate code, instead of the criminal code" (citations omitted)). The Act's registration provisions, however, are codified in the State's criminal procedure code, and so might seem to point in the opposite direction. These factors, though, are not dispositive. The location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one. In *89 Firearms,* the Court held a forfeiture provision to be a civil sanction even though the authorizing statute was in the criminal code. 465 U.S., at 364-365, 104 S.Ct. 1099. The Court rejected the

argument that the placement demonstrated Congress' "intention to create an additional criminal sanction," observing that "both criminal and civil sanctions may be labeled 'penalties.' " *Id.,* at 364, n. 6, 104 S.Ct. 1099.

\* \* \*

In analyzing the effects of the Act we refer to the seven factors noted in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), as a useful framework. These factors, which migrated into our ex post facto case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth and Eighth Amendments, as well as the Bill of Attainder and the Ex Post Facto Clauses. *See id.,* at 168-169, and nn. 22-28, 83 S.Ct. 554. Because the *Mendoza-Martinez* factors are designed to apply in various constitutional contexts, we have said they are "neither exhaustive nor dispositive," *United States v. Ward,* 448 U.S., at 249, 100 S.Ct. 2636; *89 Firearms,* 465 U.S., at 365, n. 7, 104 S.Ct. 1099, but are "useful guideposts," *Hudson,* 522 U.S., at 99, 118 S.Ct. 488. The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

By contrast [to early colonial punishments], the stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. On the contrary, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.

The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary

for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.

The State's Web site does not provide the public with means to shame the offender by, say, posting comments underneath his record. An individual seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information. The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality. The Internet makes the document search more efficient, cost effective, and convenient for Alaska's citizenry.

We next consider whether the Act subjects respondents to an "affirmative disability or restraint." *Mendoza-Martinez, supra,* at 168, 83 S.Ct. 554. Here, we inquire how the effects of the Act are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive.

The Act imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint. *Hudson,* 522 U.S., at 104, 118 S.Ct. 488. The Act's obligations are less harsh than the sanctions of occupational debarment, which we have held to be nonpunitive. *See ibid.* (forbidding further participation in the banking industry); *De Veau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (forbidding work as a union official); *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revocation of a medical license). The Act does not restrain activities sex offenders may pursue but leaves them free to change jobs or residences.

The Court of Appeals sought to distinguish *Hawker* and cases which have followed it on the grounds that the disability at issue there was specific and "narrow," confined to particular professions, whereas "the procedures employed under the Alaska statute are likely to make [respondents] *completely unemployable* " because "employers will not want to risk loss of business when the public learns that they have hired sex offenders." 259 F.3d, at 988. This is conjecture. Landlords and employers could conduct background checks on the criminal records of prospective employees or tenants even with the Act not in force. The record in this case contains no evidence that the Act has led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords. The Court of Appeals identified only one incident from the 7-year history of Alaska's law where a sex offender suffered community hostility and damage to his business after the information he submitted to the registry

became public. *Id.,* at 987-988. This could have occurred in any event, because the information about the individual's conviction was already in the public domain.

Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record. The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant.

The Court of Appeals held that the registration system is parallel to probation or supervised release in terms of the restraint imposed. 259 F.3d, at 987. This argument has some force, but, after due consideration, we reject it. Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction. See generally *Johnson v. United States,* 529 U.S. 694, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000); *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). By contrast, offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision. Although registrants must inform the authorities after they change their facial features (such as growing a beard), borrow a car, or seek psychiatric treatment, they are not required to seek permission to do so. A sex offender who fails to comply with the reporting requirement may be subjected to a criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense. Whether other constitutional objections can be raised to a mandatory reporting requirement, and how those questions might be resolved, are concerns beyond the scope of this opinion. It suffices to say the registration requirements make a valid regulatory program effective and do not impose punitive restraints in violation of the Ex Post Facto Clause.

The State concedes that the statute might deter future crimes. Respondents seize on this proposition to argue that the law is punitive, because deterrence is one purpose of punishment. Brief for Respondents 37. This proves too much. Any number of governmental programs might deter crime without imposing punishment. "To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ⋯ would severely undermine the Government's ability to engage in effective regulation." *Hudson, supra,* at 105, 118 S.Ct. 488; *see also Ursery,* 518 U.S., at 292, 116 S.Ct. 2135; *89 Firearms,* 465 U.S., at 364, 104 S.Ct. 1099.

The Court of Appeals was incorrect to conclude that the Act's registration obligations were retributive because "the length of the reporting

requirement appears to be measured by the extent of the wrongdoing, not by the extent of the risk posed." 259 F.3d, at 990. The Act, it is true, differentiates between individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense. Alaska Stat. § 12.63.020(a)(1) (2000). The broad categories, however, and the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective.

The Act's rational connection to a nonpunitive purpose is a "[m]ost significant" factor in our determination that the statute's effects are not punitive. *Ursery, supra,* at 290, 116 S.Ct. 2135. As the Court of Appeals acknowledged, the Act has a legitimate nonpunitive purpose of "public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y]." 259 F.3d, at 991. Respondents concede, in turn, that "this alternative purpose is valid, and rational." Brief for Respondents 38. They contend, however, that the Act lacks the necessary regulatory connection because it is not "narrowly drawn to accomplish the stated purpose." *Ibid.* A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance. The imprecision respondents rely upon does not suggest that the Act's nonpunitive purpose is a "sham or mere pretext." *Hendricks,* 521 U.S., at 371, 117 S.Ct. 2072 (KENNEDY, J., concurring).

In concluding the Act was excessive in relation to its regulatory purpose, the Court of Appeals relied in large part on two propositions: first, that the statute applies to all convicted sex offenders without regard to their future dangerousness; and, second, that it places no limits on the number of persons who have access to the information. 259 F.3d, at 991-992. Neither argument is persuasive.

Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is "frightening and high." *McKune v. Lile,* 536 U.S. 24, 34, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002); *see also id.,* at 33, 122 S.Ct. 2017 ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault" (citing U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 27 (1997); U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997))).

The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should

entail particular regulatory consequences. We have upheld against ex post facto challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment. *See De Veau,* 363 U.S., at 160, 80 S.Ct. 1146; *Hawker,* 170 U.S., at 197, 18 S.Ct. 573. As stated in *Hawker:* "Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application····" *Ibid.* The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause.

Our decision in *Hendricks,* on which respondents rely, Brief for Respondents 39, is not to the contrary. The State's objective in *Hendricks* was involuntary (and potentially indefinite) confinement of "particularly dangerous individuals." 521 U.S., at 357-358, 364, 117 S.Ct. 2072. The magnitude of the restraint made individual assessment appropriate. The Act, by contrast, imposes the more minor condition of registration. In the context of the regulatory scheme the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions without violating the prohibitions of the Ex Post Facto Clause.

The duration of the reporting requirements is not excessive. Empirical research on child molesters, for instance, has shown that, "[c]ontrary to conventional wisdom, most reoffenses do not occur within the first several years after release," but may occur "as late as 20 years following release." National Institute of Justice, R. Prentky, R. Knight, & A. Lee, U.S. Dept. of Justice, Child Sexual Molestation: Research Issues 14 (1997).

The Court of Appeals' reliance on the wide dissemination of the information is also unavailing. The Ninth Circuit highlighted that the information was available "world-wide" and "[b]roadcas[t]" in an indiscriminate manner. 259 F.3d, at 992. As we have explained, however, the notification system is a passive one: An individual must seek access to the information. The Web site warns that the use of displayed information "to commit a criminal act against another person is subject to criminal prosecution." http:// www.dps.state.ak.us/nSorcr/asp/ (as visited Jan. 17, 2003) (available in the Clerk of Court's case file). Given the general mobility of our population, for Alaska to make its registry system available and easily accessible throughout the State was not so excessive a regulatory requirement as to become a punishment. See D. Schram & C. Milloy, Community Notification: A Study of Offender Characteristics and Recidivism 13 (1995) (38% of recidivist sex offenses in the State of Washington took place in

jurisdictions other than where the previous offense was committed).

The excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective. The Act meets this standard.

The two remaining *Mendoza-Martinez* factors-whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime-are of little weight in this case. The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation.

Our examination of the Act's effects leads to the determination that respondents cannot show, much less by the clearest proof, that the effects of the law negate Alaska's intention to establish a civil regulatory scheme. The Act is nonpunitive, and its retroactive application does not violate the Ex Post Facto Clause.

*Smith*, 538 U.S. at 92-106, 123 S.Ct. 1146-1154.

Based on the Supreme Court's decision issued in *Smith*, this court concludes that Parker cannot establish likely success on his ex post facto, bill of attainder or double jeopardy claims as the registration and notification provisions of the Alabama Community Notification Act do not constitute "punishment" prohibited by the constitutional directives on which Parker relies. Moreover, as the Court noted, "[a] sex offender who fails to comply with the reporting requirement may be subjected to a criminal prosecution for that failure, ***but any prosecution is a proceeding separate from the individual's original offense***." *Smith*, 538 U.S. at 101-102, 123 S.Ct. at 1152. Thus, a separate prosecution for violation of the Act's registration provisions and, consequently, any punishment imposed as a result of this prosecution do not implicate double jeopardy.

## 2. Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "no State shall ... deprive any person of life, liberty, or property, without due process of law." "This provision has been interpreted to have both a procedural and substantive component when reviewing state action." *Doe v. Moore*, 410 F.3d 1342. Under the facts of this case, the court finds that Parker has failed to demonstrate a substantial likelihood of success on the merits of his claims that the Act deprives him of a constitutionally protected interest in violation of either his procedural or substantive due process rights.

Parker asserts that the Community Notification Act improperly imposes "prohibitions and restrictions on liberty, freedom, pursuit of happiness, rights of close family associations, property rights, and economic rights ... retroactively for a criminal conviction occurring over a decade prior to the Act." *Plaintiff's Complaint - Court Doc. No. 1* at 6. Parker complains that the Act deprives him of his due process rights as it "restricts where and when Plaintiff can live and work. This severely inhibits and/or removes plaintiff's const[itutionally] vested fundamental and inalienable rights of liberty and the pursuit of happiness." *Plaintiff's August 13, 2007 Response - Court Doc. No. 21* at 9. Parker further maintains that his conviction for sexual battery against a child should not be considered a criminal sex offense within the directives of the Community Notification Act as this offense occurred prior to enactment of the statute.[10] Parker also

---

[10]The court previously addressed the ex post facto nature of the due process claims.

maintains that the judgment of guilt entered on his plea of no contest is not a conviction for a criminal sex offense within the meaning set forth by the Alabama Community Notification Act. Parker therefore argues that application of the Act based on this offense will deprive him of his constitutional right to privacy in that public dissemination of his personal information will damage his reputation, prevent him from establishing a residence of his choice, negatively affect his ability to purchase property and adversely impact his ability to secure employment.

Parker's assertion that his plea of no contest is not a criminal conviction subject to the Community Notification Act is without merit as the Act by its specific and express terms applies to "[a] person convicted of a criminal sex offense, including a person who has pleaded nolo contendere [or no contest] to a criminal sex offense...." *Ala. Code* § 15-20-21(1). The Act further defines a criminal sex offense as "any crime committed in any jurisdiction which, irrespective of the specific description or statutory elements thereof, is in any way characterized or known as ... sexual battery...." *Ala. Code* § 15-20-21(4)m. The Alabama legislature therefore decided that all convicted sex offenders, including those adjudged guilty on the basis of a plea of no contest in another jurisdiction for any offense involving sexual battery, are subject to registration under the Community Notification Act. Parker's assertion that his conviction for sexual battery is not a criminal conviction subject to the Community Notification Act is likewise meritless as the Act by its specific and express terms applies to a person convicted of "any crime in any jurisdiction which, irrespective of the specific description or statutory elements thereof, is in any way

characterized or known as ... sexual battery...." *Ala. Code* § 15-20-21(4)m. Thus, the Alabama legislature expressly deemed all adults convicted in any jurisdiction for any offense involving sexual battery subject to registration under the Community Notification Act, regardless of the date of their conviction or misdemeanor/felony nature of such conviction.

(i). <u>Procedural Due Process</u>. "The more common procedural component [of the Due Process Clause] guarantees that a state will not deprive a person of life, liberty, or property without some form of notice and opportunity to be heard. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S.Ct. 2633, 2648-49, 159 L.Ed.2d 578 (2004)." *Doe v. Moore*, 410 F.3d at 1342. To succeed on a procedural due process claim, Parker must establish that (1) the Community Notification Act deprives him of a protected liberty interest, and (2) the procedures accompanying the deprivation are constitutionally inadequate. *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989). Any procedural due process argument Parker seeks to make before this court is foreclosed by *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 7, 123 S.Ct. 1160, 1164 (2003) as the only relevant fact, i.e., Parker's conviction of a criminal sex offense, is not in dispute. *Doe v. Moore*, 410 F.3d at 1342. Specifically, with respect to an adult's prior conviction for sexual battery and application of the restrictive provisions of the Alabama Community Notification Act based on such conviction, any procedural due process required prior to deprivation of life, liberty, property or the pursuit of happiness is met through the original proceedings that resulted in the conviction.

(ii).  <u>Substantive Due Process</u>.  Parker asserts that the Alabama Community Notification Act infringes upon his fundamental right to privacy and argues that the Act's restrictions on "certain residence and living accomodations, and employment locations, removes inalienable fundamental, family, economic, and property rights" are therefore violative of due process.  *Plaintiff's Complaint - Court Doc. No. 1* at 11.  He further argues that the public dissemination of information identifying him as a sex offender, including the requirement that he possess a driver's license or identification card designating him as a sex offender, causes him to suffer shame and humiliation.  *Id*. at 12.

> This substantive component protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." *See Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937); *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir.1994) (en banc).  Fundamental rights protected by substantive due process are protected from certain state actions regardless of the procedures the state uses.  *See Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997); *McKinney*, 20 F.3d at 1556.  When a state enacts legislation that infringes fundamental rights, courts will review the law under a strict scrutiny test and uphold it only when it is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993). The Supreme Court has recognized that fundamental rights include those guaranteed by the Bill of Rights as well as certain "liberty" and privacy interests implicit in the due process clause and the penumbra of constitutional rights.  *See Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2267; *Paul v. Davis*, 424 U.S. 693, 712-13, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976).  These special "liberty" interests include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2267 (citations omitted).  The Court, however, is very reluctant to expand substantive due process by recognizing new fundamental rights, explaining:
>
>> we "have always been reluctant to expand the concept of substantive due process because guideposts for responsible

> decisionmaking in this unchartered area are scarce and
> open-ended." By extending constitutional protection to an
> asserted right or liberty interest, we, to a great extent, place the
> matter outside the arena of public debate and legislative action.
> We must therefore "exercise the utmost care whenever we are
> asked to break new ground in this field," lest the liberty
> protected by the Due Process Clause be subtly transformed into
> the policy preferences of the members of this Court.
>
> *Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2267-68 (citations omitted).

*Doe v. Moore*, 410 F.3d at 1342-1343.

Substantive due process does not appear to be implicated with respect to Parker's

challenge to the dispersal of information as Parker has failed to demonstrate the existence

of a legitimate privacy interest in preventing compilation and dissemination of accurate

information that is already, albeit less conveniently, available in the public domain.  In

reaching this conclusion, the court relies on the Supreme Court's reasoning in *Smith v. Doe,*

*supra*.  "Although the issue presented in *Smith* was whether Alaska's internet registry

constituted an impermissible ex post facto statute and the registrants did not raise any

privacy claims, the Supreme Court's views as to disclosure of Megan's Law information

via the internet were made abundantly clear.  In rejecting the registrants' argument that

posting their information on the internet constituted punishment, the Court stated:  The

purpose and the principal effect of notification are to inform the public for its own safety,

not to humiliate the offender.  Widespread public access is necessary for the efficacy of the

scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.

538 U.S. at [99], 123 S.Ct. at 1150."  *A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206, 213

(3rd Cir. 2003).  The *Smith* Court likewise determined that any negative consequences

resulting from application of the registration and notification provisions at issue arose from the actions of the registrants themselves. "Although the public availability of the information [provided under the provisions of the Alaska Act] may have a lasting and painful impact on the convicted sex offender, *these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record*. The State [merely] makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant." *Smith*, 538 U.S. at 101, 123 S.Ct. at 1151. The Court further noted that the nature of the process mitigated against the offenders' constitutional concerns. Although the Alabama Act allows for personal notification via regular mail or hand delivered notices to those persons living within extremely close proximity to the convicted sex offender, "any other method reasonably expected to provide notification may be utilized, including, but not limited to, posting a copy of the notice in a prominent place at the office of the sheriff and at the police station closest to the declared residence of the released criminal sex offender, publicizing the notice in a local newspaper, or posting electronically, including the Internet, or other means available.... Nothing in this article shall be construed as prohibiting the Department of Public Safety, a sheriff, or a chief of police from providing community notification under the provisions of this article electronically or by publication or periodically to persons whose legal residence is more than the applicable distance from the residence of an adult criminal sex offender." *Ala. Code* § 15-20-25(b)-(c). Thus, the vast majority of

31

"individual[s] seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information. The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality. The Internet makes the document search more efficient, cost effective, and convenient for [the State's] citizenry." *Smith*, 538 U.S. at 99, 123 S.Ct. at 1151.

To the extent Parker argues that the Alabama Community Notification Act infringes upon his rights to family association, to seek employment and housing opportunities in certain identified areas, and to be free from threats and harassment, these allegations likewise fail to warrant issuance of preliminary injunctive relief as the Eleventh Circuit has decided substantially similar issues adversely to offenders.[11]

---

[11]The Eleventh Circuit identified the relevant portions of the Florida Sex Offender Act as follows:

The Sex Offender Act requires any sex offender to register with the local sheriff's office within 48 hours of their release from custody or relocation to a permanent or temporary residence in Florida. Fla. Stat. § 943.0435(2). The Sex Offender Act defines a sex offender as a person who "has been [c]onvicted of committing, or attempting, soliciting, or conspiring to commit, any of the [following] criminal offenses ... in this state or similar offenses in another jurisdiction:" kidnapping of a child; false imprisonment of a child under the age of 13; luring or enticing a child under 12 into a structure, dwelling or conveyance for an unlawful purpose; sexual battery; procuring child prostitution; lewd and lascivious offenses committed upon or in the presence of a person under 16; lewd and lascivious battery, molestation, or conduct; lewd and lascivious offenses committed in the presence of an elderly person, battery, and molestation; promoting a sexual performance by a child; showing obscene material to a minor; possessing child computer pornography; transmitting child pornography; buying or selling a minor with knowledge the minor will be portrayed as engaging or appearing to engage in sex acts. § 943.0435(1)(a)(1). Further, anyone moving to Florida who has been convicted of similar crimes or has been designated as a sex offender in another state will also be considered a sex offender in Florida. § 943.0435(1)(a)(2)-(3).

Upon registering with the local sheriff's office, a sex offender must provide the following: name, date of birth, social security number, race, sex, height, weight, hair and eye color, tattoos or other identifying marks, occupation and place of employment, address of permanent or legal residence or address of any current temporary residence, ... date and place of each conviction, and a brief description of the crime or crimes committed by the offender.

We must analyze a substantive due process claim by first crafting a "careful description of the asserted right." *Flores*, 507 U.S. at 302, 113 S.Ct. at 1447; *accord Glucksberg*, 521 U.S. at 720-21, 117 S.Ct. at 2268. Second, we must determine whether the asserted right is "one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Williams v. Attorney Gen. of Alabama*, 378 F.3d 1232, 1239 (11th Cir.2004) (*quoting Glucksberg*, 521 U.S. at 720-21, 117 S.Ct. at 2268), *cert. denied*, *Williams v. King*, 543 U.S. 1152, 125 S.Ct. 1335, 161 L.Ed.2d 115 (2005).

a. Careful Description

The Appellants appear to make broad claims that the Sex Offender Act infringes their liberty and privacy interests, particularly Appellants assert that the Sex Offender Act infringes their "rights to family association, to be free of threats to their persons and members of their immediate families, to be free of interference with their religious practices, to find and/or keep any housing, and to a fundamental right to find and/or keep any employment." .... Despite Appellants' broad framing of their rights in this case, however, we must endeavor to create a more careful description of the asserted right in order to analyze its importance.

Although the Supreme Court has recognized fundamental rights in regard to some special liberty and privacy interests, it has not created a broad category where any alleged infringement on privacy and liberty will be subject to substantive due process protection. *See Paul*, 424 U.S. at 713, 96 S.Ct. at 1166 (noting that personal privacy rights protected by substantive due process "must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty'"). Further, in order to trigger substantive

---

§ 943.0435(2). Within 48 hours of his or her contact with the sheriff's office, the sex offender must "report in person at a driver's license office of the Department of Highway Safety and Motor Vehicles" where he or she must identify themselves as a sex offender, obtain a driver's license or identification card, and submit to a photograph and fingerprinting. § 943.0435(3). The Department of Highway Safety and Motor Vehicles ("DHSMV") will then send the photograph and any further information to the Department of Law Enforcement ("DLE") for public notification by publication to, among other things, the internet. §943.0435(4).

If a sex offender changes residence, he or she must report to the DHSMV within 48 hours to obtain an updated driver's license or identification card. Id. When a sex offender moves out of Florida, he or she is required to notify the local sheriff's office 48 hours before leaving and give the address of his or her intended residence out of state. § 943.0435(7).

A sex offender must comply with the registration statutes for life....
*Doe v. Moore*, 410 F.3d at 1340-1341.

due process protection the Sex Offender Act must either directly or unduly burden the fundamental rights claimed by Appellants. *See Maher v. Roe*, 432 U.S. 464, 473-74, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977) (holding that the substantive due process clause "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy"); *see also Paul P. v. Verniero*, 170 F.3d 396, 405 (3rd Cir.1999) (holding that the indirect effects caused by a sex offender registration statute are "too substantially different from the government actions" in prior case law "to fall within the penumbra of constitutional privacy protection."). Thus, a careful description of the fundamental interest at issue here allows us to narrowly frame the specific facts before us so that we do not stray into broader "constitutional vistas than are called for by the facts of the case at hand." *Williams*, 378 F.3d at 1240. To do so we use the Sex Offender Act itself to define the scope of the claimed fundamental right. *Id*. at 1241. After reviewing the provisions of the Sex Offender Act and the briefs, the right at issue here is the right of a person, convicted of "sexual offenses," to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website.

b. History and Tradition

With this description, we now ask whether this right is "'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id*. at 1239. We conclude that it is not.

The circuit courts that have considered this substantive due process argument regarding sex offender registries have upheld such registration and publication requirements finding no constitutional infirmities. *See, e.g., Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir.2004) (per curiam) ("Persons who have been convicted of serious sex offenses do not have a fundamental right to be free from ... registration and notification requirements ...."); *Gunderson v. Hvass*, 339 F.3d 639, 643 (8th Cir.2003) (sex offender registration statute did not infringe the fundamental right to a presumption of innocence); *Paul P.*, 170 F.3d at 404, 405 (holding that sex offender registration did not infringe fundamental right of family relationships, and although the registration of offenders home address invaded the fundamental right to privacy, the state had a compelling interest to prevent future sex offenses). In *Paul P.*, the court held that the indirect effects of members of the public on the offender's relationship with his family did not rise to the infringement of a fundamental right by the state. 170 F.3d at 405. As the court conceded, even if the effect of registration places a constitutionally recognizable claim on the offender's family relationships, it did not fall under a fundamental

34

right classification because the sex offender statute did "not restrict plaintiffs' freedom of action with respect to their families and therefore does not intrude upon the aspect of the right to privacy that protects an individual's independence in making certain types of important decisions." *Id.*

Furthermore, in *Paul v. Davis* the Supreme Court determined that there was no fundamental right to prevent the public disclosure of a person's arrest for shoplifting. 424 U.S. at 713, 96 S.Ct. at 1166. In *Paul*, local police departments distributed fliers to area stores alerting them to possible shoplifters during the holiday shopping season. *Id.* at 694-95, 96 S.Ct. at 1157. The fliers contained the mug shot and name of the plaintiff in the case who had been arrested for and charged with shoplifting. *Id.* at 695, 96 S.Ct. at 1158. At the time of the flyer distribution, however, he had not been convicted of the crime, and shortly thereafter the charge was dismissed. *Id.* at 696, 96 S.Ct. at 1158. The Supreme Court refused to extend substantive due process protection to the publication of official acts like arrest records, noting that the right claimed was "far afield" of its previous decisions that limited a state's power to regulate private conduct. *Id.* at 713, 96 S.Ct. at 1166.

Though the Supreme Court has not addressed whether substantive due process invalidates sex offender registration statutes, *see Connecticut Dep't of Public Safety*, 538 U.S. at 8, 123 S.Ct. at 1165, we can find no history or tradition that would elevate the issue here to a fundamental right. In fact, the case law we have found supports the contrary conclusion. We can certainly understand how a person may be shunned by a person or group that discovers his past offense. However, a state's publication of truthful information that is already available to the public does not infringe the fundamental constitutional rights of liberty and privacy. Therefore, we do not review the statute with strict scrutiny, but only under a rational basis standard.

c. Rational Basis

When a statute does not implicate fundamental rights, we must ask whether it is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728, 117 S.Ct. at 2271. The rational basis standard is "highly deferential" and we hold legislative acts unconstitutional under a rational basis standard in only the most exceptional circumstances. *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir.2001).

*Doe v. Moore*, 410 F.3d at 1343-1345 (citation to brief omitted) (footnotes omitted). The

court noted "[t]he Eighth Circuit has further held constitutional an Iowa statute banning sex

offenders from living within 2000 feet of a school or child care facility, which was argued

on similar substantive due process and right to travel grounds. *See generally Doe v. Miller*, 405 F.3d 700 (8th Cir.2005)." 410 F.3d at 1344 n.5.

The Alabama legislature articulates its reasoning for the Community Notification as "the protection of the public from [recidivist criminal sex] offenders.... The system of registering criminal sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct. Comprehensive registration and periodic address verification will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly. It will allow them to alert the public when necessary for the continued protection of the community." *Ala. Code* § 15-20-20.1. In explaining its rationale for disseminating information about convicted sex offenders and establishing residency/employment restrictions, the legislature stated that "[p]ersons found to have committed a sex offense have a reduced expectation of privacy because of the public's interest in safety and in the effective operation of government. In balancing offender's due process and other rights, and the interests of public security, the Legislature finds that releasing information about criminal sex offenders to law enforcement agencies and, providing access to or releasing such information about criminal sex offenders to the general public, will further the primary government interest of protecting vulnerable populations and in some instances the public, from potential harm. The Legislature further finds that residency and employment restrictions for criminal sex offenders provide additional protections to vulnerable segments of the public such as schools and child care facilities." *Id*. Finally, the legislature

specifically expressed "that its intent in imposing certain reporting and monitoring requirements on criminal sex offenders and requiring community notification of the residence and workplace of criminal sex offenders is to protect the public, especially children, from convicted criminal sex offenders." *Id*. In light of the express intent of the legislature, this court finds that the Alabama Community Notification Act is rationally related to a legitimate government interest and, therefore, constitutional. *Doe v. Moore*, 410 F.3d at 1345 ("It has long been in the interest of government to protect its citizens from criminal activity and we find no exceptional circumstances in this case to invalidate the law.").

To the extent Parker alleges he is denied the fundamental right to reside with minor children to whom he is a parent,[12] the court finds that Parker has failed to establish a substantial likelihood of success on the merits of such a claim for two distinct reasons. First, Parker has not set forth any facts which establish standing for such a claim. Specifically, Parker does not allege that he is the parent/stepparent of a minor child or that the restrictions of the Community Notification Act have denied him the right to reside with such child. Additionally, and most importantly, when reviewing the challenged provisions of the Act's residency restrictions under a strict scrutiny test, as this court must do when

---

[12]The Alabama Community Notification Act states that an adult criminal sex offender may not reside with a minor, even where the offender is the parent or stepparent of the minor, if "[t]he adult criminal sex offender has been convicted of any criminal sex offense in which a minor was the victim and the minor resided or lived with the offender at the time of the offense[,]" or "[t]he adult criminal sex offender has ever been convicted of any criminal sex offense involving a child, regardless of whether the offender was related to or shared a residence with the child victim." *Ala. Code* § 15-20-26(c)(3)-(4). The Supreme Court has recognized child rearing as a fundamental right guaranteed protection under the Constitution. *Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2267; *Paul v. Davis*, 424 U.S. at 713, 96 S.Ct. at 1166.

a state enacts legislation that infringes on a fundamental right, the court finds the Act withstands Parker's constitutional challenge as it is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. at 302, 113 S.Ct. at 1447.

In light of the foregoing, the court concludes there is a not a substantial likelihood that Parker will succeed on the merits of a substantive due process claim.

### 3.  Equal Protection

In a response filed on September 20, 2007, Parker withdraws his equal protection claim. *Court Doc. No. 30* at 5 ("Plaintiff withdraws any Equal Protection claims."). Thus, the court will not henceforth address this issue.

### 4. Separation of Powers

Parker complains that "[t]he Alabama Judiciary and the Al. Attny. General have given the Act retroactive language the Act does not possess in violation of the separation of powers doctrine, when the Act is applied retroactively for a criminal conviction occurring over a decade prior to the Act." *Plaintiff's Complaint - Court Doc. No. 1* at 4. He further argues that the Alabama legislature violated the separation of powers by allowing the Alabama Community Notification Act to apply retroactively to offenses which occurred before passage of the Act. These claims are without factual basis.

The express provisions of the Alabama Community Notification Act direct that the Act applies to any "person convicted of a criminal sex offense...." *Ala. Code* § 15-20-21(1). Thus, neither the state courts nor the Attorney General for the State of Alabama have acted in violation of the directives of the Act but have merely enforced its terms as

written by the Alabama legislature. With respect to Parker's separation of powers claim against the Alabama legislature, this claim is devoid of merit as the Alabama legislature is the sole governing body responsible for enactment of legislation and its decision to subject all persons convicted of a criminal sex offense to the requirements of the Alabama Community Notification Act is not violative of separation of powers. As previously determined, Parker has failed to demonstrate a substantial likelihood of success on his ex post fact challenge to the Act.

### 5. Self-Incrimination

Parker asserts that the Act's requirement that he register as a sex offender due to his prior conviction for sexual battery of a child violates his right against self-incrimination. This claim, however, fails to entitle Parker to preliminary injunctive relief. Specifically, the court finds that requiring an individual to register as a sex offender under a civil regulatory scheme based on a ***prior conviction for a criminal sex offense*** does not implicate the constitutional protection against self-incrimination. *See John Doe I v. Miller*, 418 F.3d 950 (8th Cir.), *cert. denied*, *John Doe I v. Miller*, 546 U.S. 1034, 126 S.Ct. 757, 163 L.Ed.2d 574 (2005). The offender is merely acknowledging a prior ***conviction*** for an offense, a fact which is already a matter of public record, and, under such circumstances, no right of self-incrimination is implicated.

Parker also alleges that failure to register as a sex offender may result in future criminal prosecution and therefore requiring registration constitutes self-incrimination. However, "any [such] prosecution is a proceeding separate from the individual's original

offense[,]" *Smith*, 538 U.S. at 101-102, 123 S.Ct. at 1152, and Parker may at that time rely on his right against self-incrimination.  Moreover, any challenge based on possible future prosecution and potential assertion of the right against self-incrimination is simply not ripe at this time.

### 6.  Burden on Travel

Parker asserts that the Alabama Community Notification Act infringes on his fundamental right to travel as it requires that he notify Alabama law enforcement officials if he plans to transfer his residence/place of employment to a different location.  In addressing a similar provision contained in the Florida Sex Offender Act, the Eleventh Circuit determined that such law does not impermissibly burden a convicted sex offender's constitutional right to travel.  *Doe v. Moore*, 410 F.3d at 1348 ("[M]ere burdens on a person's ability to travel ... are not necessarily a violation of their right to travel."). "Though we recognize this requirement is burdensome, we do not hold it is unreasonable by constitutional standards, especially in light of the reasoning behind such registration. The state has a strong interest in preventing future sexual offenses and alerting local law enforcement and citizens to the whereabouts of those that could reoffend.  Without such a requirement, sex offenders could legally subvert the purpose of the statute by temporarily traveling to other jurisdictions for long periods of time and committing sex offenses without having to notify law enforcement.  The state has drawn a line for temporary and permanent relocation, and we hold this requirement does not unreasonably burden the [convicted offender's] right to travel."  *Id*. at 1348-1349.

### 7. Overly Broad and Void for Vagueness

Parker maintains that "the Act is overly broad and excessive in scope, application and duration ...." *Plaintiff's Complaint - Court Doc. No. 1* at 8. He further argues that residency and employment restrictions of § 15-20-26(a) are void for vagueness. "'It is a basic principle of due process that an enactment is void for vagueness if its *prohibitions* are not clearly defined.' *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1075, 71 L.Ed.2d 152 (1982) (emphasis in the original) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)). Vague enactments offend due process because they do not provide sufficient notice of what is prohibited so that people may guide their behavior accordingly, and because they risk arbitrary application by not furnishing explicit standards for those who enforce them. *Grayned,* 408 U.S. at 108-09, 92 S.Ct. at 2298- 99." *Woodruff v. United States Dept. of Labor, Office of Workers Compensation Program*, 954 F.2d 634, 642, *rehearing denied*, 961 F.2d 224 (11th Cir. 1992). A thorough review of the Alabama Community Notification Act fails to support the plaintiff's conclusory allegations. Specifically, the Act is not overly broad merely because it applies to all sex offenders regardless of the date of their conviction. Additionally, the terms of the Act are clearly defined and provide sufficient notice of that which is required of sex offenders. The court further finds that Parker's acute understanding of the Act's requirements belies his claims regarding the undue breadth and vagueness of the statute.

### III. CONCLUSION

Parker fails to establish a substantial likelihood of success on the merits of any of his claims for relief. The pleadings before the court therefore fail to demonstrate that Parker meets each of the prerequisites necessary for issuance of a preliminary injunction. Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff be DENIED.

2. This case be referred back the undersigned for additional proceedings.

It is further

ORDERED that on or before January 11, 2008 the parties may file objections to the Recommendation. Any objection must specifically identify the findings in the Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings in the Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all decisions of the former Fifth Circuit issued prior to September 30, 1981.

Done this 26th day of December, 2007.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE